UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FETCH! PET CARE, INC.,

     Plaintiff,

v.

ATOMIC PAWZ INC., et al.,

     Defendants.

Case No. 25-cv-11568

Honorable Robert J. White

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S REQUEST FOR A PRELIMINARY INJUNCTION

This case involves Plaintiff's claims against Defendants, 36 individuals or entities who entered into franchise agreements with Plaintiff, for breach of contract, trademark infringement, misappropriation of trade secrets, and conspiracy to commit tortious interference with Plaintiff's business relationships. (ECF No. 16).  On May 28, 2025, Plaintiff's filed a motion for a temporary restraining order (TRO) and a preliminary injunction. (ECF No. 2).  Following a hearing, the Court granted in part and denied in part Plaintiff's request for a TRO and set a hearing and briefing schedule on Plaintiff's request for a preliminary injunction. (ECF Nos. 12-13).  For the following reasons, the Court grants in part and denies in part Plaintiff's request for a preliminary injunction.

## I.      Background

Plaintiff is a franchisor in the business of offering various pet care services, and Defendants each entered into agreements with Plaintiff to operate Fetch! franchises. (ECF No. 16, PageID.774, 776-79).   According to the complaint, Defendants breached the franchise agreements and otherwise acted unlawfully by (1) operating businesses to compete with Fetch! and lure away its customers; (2) misappropriating Plaintiff's trademarks for use in the competing businesses; and (3) misappropriating Plaintiff's confidential information, "including without limitation its client lists, marketing information, website design and formatting, accounting information, business processes and procedures, and operations manuals." (ECF No. 16, PageID.774-75, 787-801, 803).

Plaintiff also alleges that (1) Defendants collectively engaged in "concerted effort[s]" and a "pressure campaign" to exit their Fetch! franchises, open competing businesses, and steal Plaintiff's information for use in the competing businesses; (2) various defendants unilaterally stopped paying Plaintiff royalties during this campaign; (3) Plaintiff cut off Defendants' access to its systems on May 16, 2025, after discovering that Defendants were breaching the franchise agreements and trying to misappropriate its customer lists and other information; and (4) Plaintiff received numerous anonymous, threatening voicemails following this action. (ECF No. 16, PageID.774, 787-801).   Plaintiff maintains that it has at all relevant times

2

complied with its obligations under the franchise agreements. (ECF No. 16, PageID.786).

Importantly, this case involves three distinct sets of franchisee defendants. The first group of defendants are legacy owners who purchased Fetch! franchises under an older model (Fetch! 1.0). The next group are those defendants who purchased franchises under the newer model (Fetch! 2.0). And a third subset of defendants purchased 2.0 franchises with an additional "managed services" agreement.[1] Further, some of Defendants' franchise agreements are governed under Michigan law, and the rest under Ohio law. (ECF No. 16, PageID.779-80).

Compared with Fetch! 1.0, the 2.0 model included higher fees but provided franchisees access to a Sales & Marketing Center (the SMC), which was intended to assist franchisees with generating leads and customers, scheduling, and the like. And managed-services franchisees were charged an additional fee for even more corporate support managing the businesses. Managed-services franchisees often maintained other full-time employment and were sold the Fetch! 2.0 model as an investment vehicle that could generate passive income.

---

[1] For the purpose of this order, these groups are identified as legacy franchisees/Defendants, 2.0 franchisees/Defendants, and managed-services franchisees/Defendants, respectively.

Plaintiff seeks to enjoin Defendants' continuing operation of their competing businesses and use of Plaintiff's proprietary and confidential information. (ECF Nos. 2, 20). The parties are currently engaged in arbitration.

## II. Legal Standard

A district court has discretion to grant or deny preliminary injunctions. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015). Courts must consider four factors when evaluating a motion for a preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits,
> (2) whether the movant would suffer irreparable injury absent a stay,
> (3) whether granting the stay would cause substantial harm to others,
> and (4) whether the public interest would be served by granting the stay.

*Brunner*, 543 F.3d at 361 (quoting *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)). The four factors are not prerequisites that must be met but are interrelated concerns that must be balanced together. *Ne. Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

Preliminary injunctive relief is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002). Further, courts of this circuit, when the parties have agreed to arbitrate a dispute, limit injunctive relief to be granted "only when necessary to ensure that the arbitration process is not rendered meaningless." *J.P.*

*Morgan Sec., LLC v. Duncan*, No. 22-11732, 2022 U.S. Dist. LEXIS 143924, at *10 (E.D. Mich Aug. 11, 2022).

## III.    Analysis

The Court concludes that Plaintiff fails to carry its burden of showing that these "circumstances clearly demand" a preliminary injunction. *Overstreet*, 305 F.3d at 573.  Relatedly, the Court concludes that the parties' pending arbitration would not be "meaningless" absent such relief. *J.P. Morgan Sec.*, 2022 U.S. Dist. LEXIS 143924 at *10.  The opposite is true—granting injunctive relief at this stage could fatally compromise the arbitration.  As such, Plaintiff, except as related to the limited relief already granted following the TRO hearing (*see* footnote 8), is not entitled to the drastic remedy of a preliminary injunction.

### A.    Likelihood of Success on the Merits

"A party is not required to prove his case in full at a preliminary injunction hearing." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007).  "However, in order to establish success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Id.*  "It is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

Under Michigan and Ohio law, a party asserting a breach of contract claim must establish by a preponderance of the evidence (1) the existence of a contract, (2) breach, and (3) damages. *Miller-Davis Co. v. Ahrens Constr., Inc.*, 495 Mich. 161, 178 (2014); *Quest Workforce Sols., LLC v. Job1USA, Inc.*, 75 N.E.3d 1020, 1030 (Ohio Ct. App. 2016). And "to prevail on a misappropriation-of-trade-secret claim, a plaintiff must show by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Handel's Enters. v. Schulenburg*, 765 F. App'x 117, 122 (6th Cir. 2019).

Michigan, Ohio, and federal statutes all essentially define a trade secret as (1) information (2) that is the subject of reasonable efforts to maintain its secrecy and (3) derives independent economic value from that secrecy. Mich. Comp. Laws § 445.1902(d); Ohio Rev. Code § 1333.61(D); 18 U.S.C. § 1839(3). And as relevant here, a person misappropriates another's trade secret by using it without the owner's consent, if the person knew or should have known the trade secret was acquired under circumstances "giving rise to a duty to maintain its secrecy or limit its use." Mich. Comp. Laws § 445.1902(b)(ii); Ohio Rev. Code § 1333.61(B)(2); *see also* 18 U.S.C. § 1839(5)(B).

Actual or threatened misappropriation of trade secrets may be enjoined. Ohio Rev. Code § 1333.62; Mich. Comp. Laws § 445.1903(1); 18 U.S.C. § 1836(b)(1),

(3); *see also Procter & Gamble Co. v. Stoneham*, 140 Ohio App. 3d 260, 274, 747 N.E.2d 268 (Ohio Ct. App. 2000) ("Ohio courts have held that an actual threat of harm exists when an employee possesses knowledge of an employer's trade secrets and begins working in a position that causes him or her to compete directly with the former employer or the product line that the employee formerly supported.").

Next, in Michigan, the elements of tortious interference with a business relationship are (1) the existence of a valid business relationship or expectancy; (2) the defendant's knowledge of the relationship or expectancy; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damages to the plaintiff. *BPS Clinical Lab'ys v. Blue Cross & Blue Shield of Mich.*, 217 Mich. App. 687, 698-99 (Mich. Ct. App. 1996).   Ohio similarly requires "(1) a business relationship; (2) the wrongdoer's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Barilla v. Patella*, 144 Ohio App. 3d 524, 532 (Ohio Ct. App. 2001).

Civil conspiracy in Michigan is the "combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Courser v. Allard*, 969 F.3d 604, 622 (6th Cir. 2020).  Ohio similarly defines civil conspiracy as "a malicious combination of two or more persons to injure another in person or property, in a way

not competent for one alone, resulting in actual damages." *Lawyers Title Co., LLC v. Kingdom Title Solutions, Inc.*, 592 F. App'x 345, 355 (6th Cir. 2014).  Malice requires a wrongful act done "purposely, without a reasonable or lawful excuse." *Id.*

Lastly, "a plaintiff alleging trademark infringement must show that: (1) it owns the registered trademark; (2) the defendant used the mark in commerce; and (3) the use was likely to cause confusion." *Libertarian Nat'l Comm., Inc. v. Saliba*, 116 F.4th 530, 534 (6th Cir. 2024) (cleaned up).

Here, Defendants argue that Plaintiff cannot show a likelihood of success on its claims because it (1) was first to breach the franchise agreements and/or committed various disclosure violations with respect to Fetch! 2.0; and (2) has unclean hands that prohibit injunctive relief.[2] (ECF No. 22); *see Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 957 (6th Cir. 2013) (analyzing the defendant's first-breach defense to preliminary injunctive relief under the likelihood-of-success prong); *1-800 Water Damage Int'l LLC v. Restoration RX, LLC*, No. 24-10110, 2024 U.S. Dist. LEXIS 135488, at *14-15 (E.D. Mich. Jul. 31, 2024) (analyzing the defendant's unclean-hands defense to preliminary injunctive relief under the likelihood-of-success prong).

---

[2] These are essentially the same assertions, at least factually, as Defendants' current claims in the pending arbitration.

The Court will first address unclean hands.  "The concept of unclean hands may be employed by a court to deny injunctive relief where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party." *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1383 (6th Cir. 1995); *Lucky's Detroit, LLC v. Double L, Inc.*, 533 F. App'x 553, 561-62 (6th Cir. 2013).  "The doctrine of unclean hands requires that the alleged misconduct on the part of the plaintiff relate directly to the transaction about which the plaintiff has made a complaint." *Performance Unlimited*, 52 F.3d at 1383.  "Thus, the doctrine is to be applied only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation." *Id.* (cleaned up).  "The unclean hands doctrine can be applied only to conduct relating to the matter in litigation." *Id.* (cleaned up).  "[T]he doctrine is not to be used as a loose cannon, depriving a plaintiff of an equitable remedy to which he is otherwise entitled merely because he is guilty of unrelated misconduct." *Id.* (cleaned up).  Unclean hands cannot be lightly inferred, and must be established by "clear, unequivocal[,] and convincing evidence." *Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 714 (E.D. Mich. 2015) (citing *Kearney & Trecker Corp. v. Cincinnati Milacron Inc.*, 562 F.2d 365, 371 (6th Cir. 1977)

Defendants argue that Plaintiff has unclean hands based on various disclosure violations with respect to attracting Fetch! 2.0 franchisees.  Defendants emphasize that "[n]early all of the franchisees operating under Fetch! 2.0 have failed or are failing," and that Plaintiff "is facing substantial claims from more than half of its franchisees seeking rescission of their contracts." (ECF No. 22, PageID.1056-57).

While the Court does not decide whether Plaintiff substantively violated any franchise disclosure requirements,[3] it concludes that Plaintiff's general conduct in advertising and selling 2.0 franchises evidences bad faith sufficient to deny injunctive relief with respect to the 2.0 Defendants (including the managed-services Defendants).  Specifically, although the Court cannot say from these truncated proceedings whether Plaintiff misrepresented any specific disclosure(s), the evidence as a whole circumstantially supports[4] that Plaintiff aggressively and dishonestly marketed and sold the 2.0 franchises.

---

[3] Because numerous and substantial factual questions remain concerning the accuracy of and basis for the relevant disclosures, the Court leaves this issue for arbitration.

[4] Given the limited nature of these proceedings and the evidence available, nothing in this opinion is to be construed as a conclusion on the merits or as otherwise binding on the parties' dispute in arbitration.  *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("A hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules. . . . Thus, as a prudential matter, it bears remembering the

First, even if not an outright disclosure violation, the fact that Plaintiff changed its disclosures in 2020 to remove any distinction between 1.0 and 2.0 franchisees' operations and performance (ECF Nos. 29-1 – 29-12) supports a finding of bad faith and impairs their likelihood of success on the merits.  One need only compare the two Franchise Disclosure Documents, and consider the sworn testimony of Defendants, to spot the issue.

The Franchise Disclosure Document from 2018 (pictured below as *Figure 1*) contains a section for financial performance representations, Item 19.  It is replete with examples of the structural differences between the Fetch 1.0 and Fetch 2.0 business models.

**Royalty Fee**

| Fetch' 2 0 | Fetch' 1 0 |
|---|---|
| 7% of gross sales paid weekly for preceding week, subject to minimum fee | 6% of gross sales paid monthly for preceding month |

**Franchisee Support Fee**

| Fetch' 2 0 | Fetch' 1 0 |
|---|---|
| 15% of gross sales paid weekly for preceding week for sales under $1923 and 11% paid weekly for preceding week for sales exceeding $1923, subject to minimum fee | No Franchisee Support Fee |

---

obvious: that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits.").  Following a full trial on the merits of the parties' respective claims, the arbitrator may very well conclude differently than the Court here.

*Figure 1- Fetch! 2018 Financial Disclosure Document*

But by 2020, the critical distinctions in the business models are removed from Item 19 and replaced with general performance metrics which reflect high maximum gross sales, while the fact a potential investor would be buying into an obviously disparate business model is obscured.

**TABLE 1**

| | Franchisee Count \| Average Number of Territories | 2022 Gross Sales for Franchisees Open Entire 2022 Calendar Year | | | | Franchisees with Sales Greater than or Equal to Quintile Average | |
|---|---|---|---|---|---|---|---|
| Quintile Group | | Maximum | Average | Median | Minimum | Franchisee Count | % Quintile |
| Top 33% | 5 \| 2.8 | $1,019,378.35 | $705,661.74 | $808,944.87 | $298,614.10 | 4 | 80.00% |

*Figure 2- Fetch! 2023 Financial Disclosure Document*

Importantly, this change occurred two years after Fetch! 2.0 began, and immediately upon Fetch! being purchased by its current owner, Gregory Longe. And when questioned, Longe offered no substantive basis for this change.

The record also includes video of Longe himself representing the opportunity to potential franchisees as "very profitable." (ECF No. 29-16). In another video publicly available online, Longe speaks emphatically about the ability for franchisees to generate $900,000 in gross sales. (ECF No. 29-17). In his testimony, however, Longe acknowledged that only legacy franchisees ever reached this level of sales, no 2.0 franchise has numbers like any legacy franchisee, and he was selling only 2.0 franchises when these statements were made. Longe testified that he utilized consultants to assist in recruiting new franchisees, and 2.0 Defendant Kristen

Venetsanos testified that one such consultant told her similar areas were bringing in $1 million in revenue.

The Court considers all these facts along with the 2.0 Defendants' largely consistent and credible testimony[5] that (1) they were never made aware of even the existence of two separate franchise systems when deciding to join Fetch!, including in discussions with existing franchisees; (2) they only became aware of this distinction well after joining Fetch!, when speaking with other franchisees; (3) they consistently lost money due to the excessive fees required, and inadequate support provided, under Fetch! 2.0; and (4) this underperformance effectively forced them out of their agreements/to leave the system.

This testimony of the 2.0 Defendants was corroborated by credible testimony from a legacy Defendant, Lorrie Culp, who said she participated in group calls to

---

[5] Although Plaintiff argues that unclean hands need be established for each Defendant individually, the Court—at least where possible—construes consistent testimony among a particular subset of witnesses (the 2.0 Defendants, for example), as applying to the group as a whole. Given the nature of this dispute, it would be impossible to take testimony from and make determinations for each Defendant separately. *See Camenisch*, 451 U.S. at 395 (1981) ("a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Heideman*, 348 F.3d at 1188 ("A hearing for preliminary injunction is generally a restricted proceeding, often conducted under pressured time constraints, on limited evidence and expedited briefing schedules. . . . Thus, as a prudential matter, it bears remembering the obvious: that when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits."). This same analysis applies to the first-breach issue.

prospective 2.0 franchisees encouraging them to invest, and without knowing they would be operating under a separate (less profitable) management structure. She did so until March 2023, when she first discovered the existence of the 2.0 model, and stopped because she was no longer comfortable doing so.

Considering all this evidence together, the Court finds sufficient evidence of unclean hands on the part of Plaintiff by aggressively recruiting 2.0 franchisees while obscuring from them the true and full nature of the business and expected financial performance. And the evidence of Plaintiff's bad faith was even more egregious concerning the managed-services Defendants (as a subset of the 2.0 Defendants). Indeed, although Longe said the 2.0 Defendants could have been successful if only they put forth more individual effort, the managed-services Defendants consistently testified to understanding—when they signed on with Fetch! and based off Plaintiff's representations—that the arrangement essentially involved a passive investment, not a full-time job.

Lastly, to the extent Plaintiff argues that unclean hands is inapplicable here because any alleged disclosure violation is unrelated to Defendants' later operation of competing businesses, the Court disagrees. Again, the 2.0 Defendants consistently and credibly testified they were initially unaware of any differences between Fetch! 1.0 and 2.0, they were never profitable under the 2.0 terms, and this lack of success effectively forced them out of their agreements. Because there is

evidence of Plaintiff's bad faith as an underlying cause of the 2.0 Defendants' allegedly-improper conduct at issue here, unclean hands applies.  For these reasons, the Court denies injunctive relief with respect to the 2.0 Defendants, including the managed-services Defendants.

Concerning the remaining legacy Defendants, the Court now turns to Defendants' first-breach issue.  Under Michigan law, "[o]ne who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *L.A. Ins. Agency Franchising, LLC v. Kutob*, 817 F. App'x 52, 60 (6th Cir. 2020).  "However, the first breach rule only applies when the initial breach is substantial." *Id.*  "A substantial breach is one that has effected such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party." *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 957 (6th Cir. 2013) (cleaned up).[6]

---

[6] Ohio law similarly "relieves a party of liability for its breach of a contract if the other party materially breaches the contract first," *i.e.*, "fail[s] to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Constellation NewEnergy, Inc. v. Carborundum Grinding Wheel Co.*, 2017 U.S. Dist. LEXIS 37969, *6 (S.D. Ohio Mar. 16, 2017).

As an initial matter, it is undisputed that the legacy Defendants are all currently operating competing businesses and thus in breach of their Fetch! noncompete agreements. And the Court rejects Defendants' contention that Plaintiff committed the first substantial/material breach by failing to provide an adequate website.[7] Specifically, none of the alleged website issues rise to a level such that the legacy Defendants' performance was ineffective or impossible. Rather, the record shows that the legacy Defendants continued operating largely successful, profitable franchises even throughout the changes instituted by Plaintiff's new ownership.

However, the Court finds sufficient evidence at this stage that Plaintiff committed the first material/substantial breach by cutting off the legacy Defendants' access to the Fetch! system *before* these Defendants ever operated competing businesses or improperly used Plaintiff's confidential and/or proprietary information. First, the record shows that the legacy Defendants were all current in their payments and still operating as Fetch! franchises when Plaintiff terminated Defendants' agreements and cut off their access on May 16, 2025. Regardless of whether the terminations themselves violated the franchise agreements or applicable state law, the cutting off access to Fetch!'s systems certainly made any further performance by the legacy Defendants ineffective or impossible.

---

[7] Because the Court has already resolved this matter concerning the 2.0 Defendants under the doctrine of unclean hands, it does not address Defendants' first-breach arguments specific to the 2.0 model and the SMC.

The Court acknowledges that various efforts with respect to the competing businesses, such as the registration of new business names, occurred as early as Fall 2024, well before the legacy defendants were cut off.  But the agreements here specifically prohibited franchisees from "divert[ing]" or attempting to divert business or clients to a Fetch! competitor, or else "own[ing], operat[ing], [or] engag[ing] in" a competing business within certain geographic limitations. (ECF No. 1-2, PageID.63; ECF No. 1-3, PageID.117-18).  Accordingly, the Court concludes that the legacy Defendants' breach did not occur until they actually took such action, *i.e.*, until after they were cut off, stopped operating under the Fetch! name, and started communicating with clients about the new businesses. *See Material Handling Sys. v. Cabrera*, 572 F. Supp. 3d 375, 392 (W.D. Ky. 2021) (the defendant likely breached a similar noncompete by "founding *and operating*" a competing business) (emphasis added).

This same analysis also applies with respect to the legacy Defendants' use of Plaintiff's client information and trademarks.  The applicable contract language states that "all information about clients of Franchisee . . . is owned by Franchisor and Franchisee is merely licensed to use the same pursuant to and in accordance with this Agreement . . . ." (ECF No. 1-2, PageID.48; ECF No. 1-3, PageID.104).  And franchisees are permitted to use Fetch!'s proprietary marks while operating Fetch! franchises pursuant to the agreements. (ECF No. 1-2, PageID.46-48; ECF No. 1-3,

PageID.101-04).  Accordingly, no breach occurs until a franchisee actually starts using Plaintiff's information or marks in way not allowed under the agreement, *e.g.*, when used to benefit to a competing business.

Critically, the legacy Defendants consistently and credibly testified that, until Plaintiff cut off their access, they had no intention of leaving and competing with Fetch!—at least while the dispute in arbitration remained pending.  According to these Defendants, their earlier efforts were only preparatory pending the result of arbitration, or on the chance Plaintiff retaliated against them.  And when questioned on cross examination, Longe acknowledged that none of the legacy Defendants ever indicated an intent to leave Fetch! or stop paying royalties when cut off.  Further, although disputed by Longe, the legacy Defendants consistently testified that downloading information from the Fetch! system was not unusual or improper in their years of experience as franchisees.

The Court acknowledges a "Client Transition Letter and Timeline" in the record showing a proposed timeline of late May (presumably 2025), just after the mass download of Fetch! information, where franchisees would (1) notify clients of a pending transition to a new business, (2) transfer clients to a new system while still performing work through Fetch!, (3) cease operating under Fetch! once all clients and services were transferred.  Nevertheless, this was a "possible," "sample"

timeline to be used if franchisees "are forced to leave the Fetch system," and assuming two weeks' notice of any such action. (ECF No. 34-2).

In the Court's view, this record provides sufficient evidence that the legacy Defendants' respective breaches all occurred after Plaintiff first breached by cutting of their access, when they were effectively prohibited by Plaintiff's unilateral action from continuing under the Fetch! system; Plaintiff therefore has failed to demonstrate a likelihood of the merits on its breach of contract claim. *See Maaco Franchising, LLC v. Ghirimoldi*, No. 15-99, 2015 U.S. Dist. LEXIS 98336, at *19-20 (W.D.N.C. Jul. 28, 2015) ("[T]he Court is convinced that Defendants have raised sufficient factual allegations which, if true, may support a material breach of the Franchise Agreement by Maaco.  Consequently, Maaco has failed to demonstrate it is likely to succeed on the merits of its breach of contract claim.").

The Court certainly does not condone the coordinated theft of proprietary customer data, and the mass download in May 2025 does raise questions. Nevertheless, given the testimony and unique nature of this case, it is entirely reasonable that the legacy Defendants' conduct before they were cut off and actually began competing with Plaintiff was done with the expectation of rescission if they succeeded in arbitration.

That said, the Court concludes that Plaintiff has established a likelihood of success on the merits of its claim for misappropriation of trade secrets.  First, it is

undisputed that once the legacy Defendants were cut off from the Fetch! system, they used the client information already downloaded from Fetch! in order to continue serving clients under their new, competing businesses. *See Procter & Gamble Co.*, 140 Ohio App. at 274 ("an actual threat of harm exists when an employee possesses knowledge of an employer's trade secrets and begins working in a position that causes him or her to compete directly with the former employer or the product line that the employee formerly supported."). Next, this use was improper because it was clearly prohibited under the franchise agreements. *See Follmer, Rudzewicz & Co., P.C. v. Kosco*, 420 Mich. 394, (Mich. 1984) ("While an employee is entitled to unrestricted use of general information acquired during the course of his employment or information generally known in the trade or readily ascertainable, confidential information, including information regarding customers, constitutes property of the employer and may be protected by contract."). And the Court finds that the information constitutes trade secrets because (1) it was protected within the Fetch! system and not publicly available; and (2) it indisputably, given the testimony of both parties' witnesses, derives economic value for both franchisor and franchisees. *See James B. Oswald Co. v. Neate*, 98 F.4th 666, 670, 675-76 (6th Cir. 2024) (finding a likelihood of success on the merits under similar facts).

The Court similarly concludes that—to the extent Plaintiff seeks to enjoin the inclusion of old Fetch! reviews on the Google business pages for Defendants' new

businesses[8]—Plaintiff has established a likelihood of success on the merits of its claim for trademark infringement.   Here, the first two elements for trademark infringement are met because Plaintiff has a registered trademark for the Fetch! name (ECF No. 33-8), and the Fetch! name appears in numerous reviews on the legacy Defendants' respective Google pages for the new businesses.   Indeed, the video of Defendant Sandra Wang regarding the Google pages[9] shows that Defendants all took specific, intentional steps in order to transition these pages to their new business names while still retaining old customer reviews that reference Fetch!.[10]   Given these facts, the Court also concludes that the continued reference to Fetch! with respect to the legacy Defendants' new businesses is likely to cause confusion.   Specifically, even if only mentioned in older reviews, the Fetch! name gives the wrong impression that the new businesses are still somehow affiliated with Fetch!.

---

[8] Because there is seemingly no current dispute concerning the limited relief granted following the TRO hearing to prohibit all use of Fetch! marks, excluding "customer reviews on websites such as Yelp or Google that mention Fetch!" if not linked to Defendants' websites for their own use (ECF No. 12), this prohibition is continued, and Plaintiff's motion is granted as it relates to this relief.

[9] This video was played at the hearing and included as an exhibit for both Plaintiff and Defendants, but it is not currently docketed.

[10] Plaintiff also presents evidence that the Fetch! name still appears on various of Defendants' own websites and other materials, including those for legacy Defendant Tamara Bean. (ECF No. 33-19, 34-8 – 34-12).

Regarding Plaintiff's claim for a conspiracy to commit tortious interference with business relationships, however, the Court concludes that Plaintiff has established a mere possibility of success. As an initial matter, it is clear here that (1) the legacy Defendants began soliciting former Fetch! clients to their new, competing businesses once cut off from the Fetch! system, thus depriving Plaintiff of the revenue associated with these clients; (2) the legacy Defendants continue to serve these clients; and (3) Plaintiff had a business relationship or expectancy with respect to its franchisees' clients. With respect to establishing an underlying claim of tortious interference, these facts typically would suffice. *See Comforcare Franchise Sys., LLC v. Comforcare Hillsboro McMinnville Corp.*, No. 19-12037, 2019 U.S. Dist. LEXIS 225317, at *2-4, 14-15 (E.D. Mich. Oct. 28, 2019) (under similar facts and the same tortious-interference claim, enjoining the defendant from soliciting and contacting "[Plaintiff's] clients that they were not servicing at the time that Plaintiff filed its emergency motion for preliminary injunction."); *Frontier Corp. v. Telco Commc'ns Group, Inc.*, 965 F. Supp. 1200, 1208 (S.D. Ind. 1997) ("[a]n employer has a reasonable business interest in protecting its good will and, specifically, in restricting its former employees from enticing away the employer's old customers."); *JTH Tax, LLC v. White*, No. 22-272, 2023 U.S. Dist. LEXIS 81353, at *14 (E.D. Va. May 8, 2023) (under similar facts, "[the plaintiff franchisor] had business relationships at the franchise locations the defendant operated, . . . [and] the

defendant [franchisee] knew [the plaintiff] expected her franchises to produce business for [the plaintiff]").

Nevertheless, the Court concludes that too many factual disputes exist to establish a likelihood of success that the legacy Defendants ever engaged in any unlawful or malicious conspiracy. *See Martin v. Bimbo Foods Bakeries Distrib.*, No. 14-17, 2014 U.S. Dist. LEXIS 73992, at *14-15 (E.D.N.C. May 30, 2014) ("[because] the factual disputes regarding whether defendant properly terminated the Distribution Agreement are legion . . . , the court concludes that plaintiff has not clearly shown that he will likely succeed on the merits of his breach of contract claim"); *Wellin v. Wellin*, No. 13-1831, 2013 U.S. Dist. LEXIS 166139, at *12 (D.S.C. Nov. 22, 2013) ("a number of courts have declined to issue a preliminary injunction when there are significant factual disputes"); *Torres Advanced Enter. Solutions LLC v. Mid-Atl. Prof'ls Inc.*, No. 12-3679, 2013 U.S. Dist. LEXIS 21722, at *8 (D. Md. Feb. 8, 2013) ("courts have 'declined to issue a preliminary injunction when there are significant factual disputes' in breach of contract cases.") (citation omitted); *Chattery Int'l, Inc. v. Jolida, Inc.*, No. 10-2236, 2011 U.S. Dist. LEXIS 32399, at *27-39 (D. Md. Mar. 28, 2011) (concluding that based, in part, on the existence of factual questions, plaintiff had not clearly shown likelihood of success on its trademark infringement claim).

Plaintiff argues that Defendants' improper conduct with respect to their independent franchise association (the association) and their associated preparations to compete with Fetch! show a conspiracy "to tortiously interfere with Fetch!'s business expectancy that it would not need to compete in the Defendants' markets with them for two years after they left." (ECF No. 20, PageID.941).   But, as discussed, the legacy Defendants presented significant evidence that they had no intention of leaving and competing with Fetch! until Plaintiff improperly cut off their access, and that their earlier efforts were only preparatory pending the result of arbitration, or on the chance Plaintiff retaliated against them.   They also testified that that the association was initially established to address legitimate issues with Plaintiff's operation of the franchise system.

Given the record, it is reasonable to conclude that the legacy Defendants were merely trying advocate for themselves—and ultimately pursue what they view as legitimate claims for rescission in arbitration—but Plaintiff's unilateral action effectively forced them to begin operating competing businesses before the claims could be adjudicated.   Although a trier of fact (here, the arbitrator) deciding the merits could deem Defendants not credible and find they intended to compete with Fetch! no matter what and regardless of the pending arbitration, that is not something the Court is willing to do given the restricted nature of this proceeding, with only limited evidence and expedited briefing.

24

### B.   Irreparable Injury

"To be granted an injunction, the plaintiff must demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury." *Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 969 (6th Cir. 2002) (cleaned up).  A moving party suffers irreparable harm if the harm "is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578.  An injury is not fully compensable by monetary damages "if the nature of the [moving party's] loss would make the damages difficult to calculate." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).  The injury "must be both certain and immediate, not speculative or theoretical." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (cleaned up).  Irreparable harm "is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* (emphasis in original).

As an initial matter, "loss of customer goodwill *often amounts* to irreparable injury because the damages flowing from such losses are difficult to compute," and "loss of fair competition that results from the breach of a non-competition covenant is *likely* to" cause irreparable harm. *Basicomputer Corp.*, 973 F.2d at 512 (emphasis added); *see also Certified Restoration*, 511 F.3d at 550 ("[t]he likely interference with customer relationships resulting from the breach of a non-compete agreement is the kind of injury for which monetary damages are difficult to calculate").

25

But Plaintiff must still present clear and convincing evidence that such injury is certain and immediate. *See CPM Acquisition Corp. v. Easterday*, No. 24-605, 2024 U.S. Dist. LEXIS 138092, at *24 (E.D. Mich. Aug. 5, 2024) ("Certainly, the breach of a noncompete agreement and the misappropriation of trade secrets *may* cause irreparable harm.  But this does not vitiate the burden of showing . . . by clear and convincing evidence . . . that such harm is both imminent and likely.") (emphasis in original); *Patio Enclosures*, 39 F. App'x at 969 (affirming denial of a preliminary injunction for noncompetition and trade secrets claims in part because plaintiff failed to demonstrate irreparable injury); *Apex Tool Grp., LLC v. Wessels*, 119 F. Supp. 3d 599, 609 (E.D. Mich. 2015) (denying a preliminary injunction for a breach of a noncompete agreement in part because the plaintiff failed to establish how the defendant's actions harmed or would likely harm its customer goodwill and competitive position).

Here, Longe, Plaintiff's owner, testified that Defendants'[11] opening of competing businesses has reduced Plaintiff's revenue and forced it to lay off employees.  He also said that Defendants' continued operation would be a disaster for existing Fetch! franchisees forced to unfairly compete with Defendants, who would have the benefits of Fetch!'s confidential information without paying

---

[11] Although the Court has already resolved this matter concerning the 2.0 Defendants under the doctrine of unclean hands, it addresses the remaining factors with respect to Defendants collectively because that is how the arguments are presented.

royalties.  And Longe highlighted potential difficulties in attracting new franchisees, as well as the risk of losing additional existing franchisees, absent an injunction. According to Longe, Defendants would essentially be stealing the goodwill Fetch! developed over years.

Notably, Longe testified that significant damage to the Fetch! brand has already been done by Defendants' efforts to steal its customers and badmouth ownership, and that it would be difficult to recoup the customers now controlled by Defendants.  But Longe said existing, experienced franchisees were prepared to step in and operate in Defendants' territories, and he expected at least some customers to return.

First, any loss of revenue to Plaintiff is compensable with monetary damages. And the Court is unpersuaded regarding the potential inducement of franchisees to leave the system.  To the extent Defendants or any other franchisee inexcusably violates a noncompete, Plaintiff can vindicate its rights in arbitration per the franchise agreements. *See Pirtek USA, LLC v. Zaetz*, 408 F. Supp. 2d 81, 86 (D.C. Conn. 2005) ("A denial of this preliminary injunction will not encourage other franchisees that they can abandon their franchise agreements as they may be held liable for doing so").

The Court ultimately concludes that Plaintiff has not established irreparable injury because (1) much of the damage here has already been done and (2) any future loss to goodwill or fair competition is too speculative.

First, as stated, Longe testified that significant damage to the Fetch! brand has already been done by Defendants' efforts to steal its customers and badmouth ownership. *See TRBR, Inc. v. GM, LLC*, No. 20-11269, 2022 U.S. Dist. LEXIS 203405, at *8 (E.D. Mich. Nov. 8, 2022) ("a past harm . . . is not an adequate basis for a preliminary injunction").  To further this point, the record shows that both Plaintiff and Defendants—following the May 2025 terminations and when Defendants started operating competing businesses—communicated with clients to place blame on one another. (*See* ECF Nos. 29-18 – 29-19, 33-18, 33-20, 35-2).  And Defendants consistently testified that their clients, based on the now-ingrained belief that Plaintiff is at fault, have no desire to return to Fetch! even if an injunction is granted.  Because this loss of clients and goodwill apparently manifested before Plaintiff moved for relief, it is a past harm and not adequate to justify an injunction.

Next, given the unique circumstances of this case, any future harm is too speculative for several reasons.  First, Plaintiff already cut Defendants off from its system and terminated them as franchisees. *See JTH Tax LLC v. Alexia Agnant & Demetress Corp.*, No. 22-2385, 2022 U.S. Dist. LEXIS 89500, at *30-31 (E.D.N.Y. May 17, 2022), *aff'd* 62 F.4th 658 (2nd Cir. 2023) (injury from alleged use of

valuable client information mooted in part where the defendant is locked out of franchise systems); *id.* at \*31-32 (testimony about the defendant franchisee serving the plaintiff franchisors' clients at a new, competing business insufficient to establish irreparable injury in part because the plaintiff "ended its relationship with the [defendant's] customers" when it terminated the defendant's franchise agreement).

The Court also finds it unlikely that Plaintiff could step in to cover Defendants' customers. *See id.* at \*32 ("[The plaintiff] has not offered any evidence that it intended to immediately open a company store at or near those locations or that there are any 'prospective franchisees' imminently seeking to enter those markets, and thus any harm it claims with respect to permanently losing 'the local tax preparation service market' is speculative, at best."); *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, No. 11-325, 2011 U.S. Dist. LEXIS 40586, at \*15-16 (S.D.N.Y. Apr. 11, 2011) (finding the plaintiff's harm "speculative" because it "d[id] not state even a current intention to reenter the market [against the defendant], only a possibility that it may do so").

Although disputed in the record, Defendants consistently and credibly testified that Plaintiff would be unable to service their locations. For example, legacy Defendant Bean effectively testified that her clients would not return to Fetch! because (1) pets are treated like family and client trust is therefore pivotal in this business; (2) she has close, longstanding, and personal relationships with her

clients; and (3) many if not all of her clients—since Defendants were terminated—
are shocked and disgusted by Plaintiff's actions.  And Longe himself testified that it
would be difficult to recoup the customers now controlled by Defendants.  In the
Court's view, these facts hinder Plaintiff's injury from rising beyond the level of
mere speculation.

Most importantly, though, where the merits of Plaintiff's claims must
ultimately be resolved in a pending arbitration, Plaintiff fails to show that the harm
will be severe enough in relation to its total business as necessary to establish that
arbitration would be rendered meaningless.  Critically, authority of this circuit, with
respect to claims pending in or subject to arbitration, indicates that a preliminary
injunction is only warranted where the injury is of such significance that it threatens
the entirety of a plaintiff's business.  *See Performance Unlimited*, 52 F.3d at 1382,
("the type of irreparable harm which Performance is likely to suffer, the [complete]
loss of its business, is precisely the type of harm which necessitates the granting of
preliminary injunctive relief pending arbitration, because the arbitration will be a
meaningless or hollow formality unless the status quo is preserved pending
arbitration"); *Nexteer Auto. Corp. v. Korea Delphi Auto. Sys. Corp.*, No. 13-15189,
2014 U.S. Dist. LEXIS 18250, *at 1, 30-31 (E.D. Mich. Feb. 13, 2014) ("[Following
*Performance Unlimited*, w]hether or not the loss of customer goodwill amounts to
irreparable harm often depends on the significance of the loss to the plaintiff's

overall economic well-being.  Nexteer has failed to show that the loss . . . threatens its overall financial health to such a degree that such losses cannot be made whole with money damages.").  Here, Plaintiff makes no showing that any injury rises to such a level.

For these reasons, the Court concludes that Plaintiff fails to establish irreparable injury.  To the extent that Plaintiff relies on the contract language stating that breaches of confidentiality/non-compete provisions result in irreparable injury, this does not suffice to change the Court's decision.  *See Nexteer*, 2014 U.S. Dist. LEXIS 18250 at * 27 ("numerous courts have held that such a contractual provision does not alter the court's obligation to analyze whether the party seeking an injunction has proven irreparable harm").

## C.    Harm to Others

"The third factor for a court to consider is whether the issuance of the injunction would cause substantial harm to others." *Certified Restoration*, 511 F.3d at 550-51 (cleaned up).  Generally, the harm-to-others prong is evaluated "in terms of the balance of the hardship between the parties." *Superior Consulting Co., Inc. v. Walling*, 851 F. Supp. 839, 848 (E.D. Mich. 1994).

The Court concludes that this factor favors Defendants.

The Court first acknowledges that it is not a significant hardship to honor freely entered contractual commitments.  *See Superior Consulting Co., Inc. v.*

31

*Walling*, 851 F. Supp. 839, 848 (E.D. Mich. 1994) ("[T]he injunction sought by [Plaintiff] only prevented [Defendant] from violating his freely entered contractual obligations."). Nevertheless, the balance of the equities tips in Defendants favor in part because they raised substantial issues, discussed above, regarding Plaintiff's role in effectively forcing them, before their claims in arbitration were resolved, to compete with Fetch!. *See Dunkin' Donuts Franchising, LLC v. Panzar Boston Post, LLC*, No. 10-4188, 2010 U.S. Dist. LEXIS 164634, at *3 (S.D.N.Y. Aug. 16, 2010) ("Defendants have raised substantial issues concerning Plaintiffs' role in causing the financial difficulties Defendants have experienced that brought about the default in performance Plaintiffs complain about, and that tips the balance of equities in Defendants' favor.")

Further, to the extent that either Plaintiff or Defendants will suffer hardship depending on the Court's decision, the harm to Defendants—the loss of their entire business and, for many, their entire source of income, as well as the termination of all their employees—is greater than that to Plaintiff. *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 126 (2nd Cir. 1984) ("It is equally clear that the equities tip decidedly in favor of Roso-Lino. It is unlikely that Coca-Cola will suffer greatly if the eleven-year relationship is continued for a short while. The two owners of Roso-Lino, on the other hand, stand to lose their business forever."); *Comforcare*, 2019 U.S. Dist. LEXIS 225317 at *12-13 ("the fact

that Defendants could lose their entire business from the full injunction requested by Plaintiff tilts slightly in favor of a more narrow order").

The practicalities of this case also warrant mention. At least concerning the profitable legacy Defendants, Plaintiff's proposed injunctive relief could ultimately inflict self-harm if they succeed in arbitration with Defendants. Specifically, it would be in Plaintiff's interest for profitable franchises to continue operation pending resolution of the merits of the parties' respective claims because this would maximize the ultimate damage awarded. This is especially true where there is only a possibility that Plaintiff could recoup more than a fraction, if any, of Defendants clients were they to shut down. *See Kahala Franchising, LLC v. Real Faith, LLC*, No. 21-08115, 2022 U.S. Dist. LEXIS 91420, at *16-17 (C.D. Cal. May 30, 2022) ("[T]he Court can reasonably assume that granting the Motion will cause business at the franchise location to cease, at least temporarily. This would have negative consequences on both Kahala and Defendants: Kahala, because it would no longer earn any royalties or other compensation from operation of the location, and Defendants, because it would effectively eliminate most or all of their business income.").

The same is true concerning the continued use of old Fetch! reviews. Defendants testified that exposure on Google is critical to their success and discussed the devastating effect were they to start new business pages from scratch. Assuming

Plaintiff can prevail on the merits of its claims at arbitration, it is in Plaintiff's best interest for Defendants to be as financially successful as possible until then. Any court order requiring Defendants to delete all mentions of Fetch! (to include potentially years of positive reviews) on Google pages Defendants currently manage would impair their ability to remain financially profitable pending the outcome of arbitration, thus devaluing the franchisees and reducing any potential damages awarded to Plaintiff.

But Defendants should be on notice—their continued use of a Google page created as a franchisee under the direction of Fetch! may ultimately entitle Plaintiff to further damages, and the reassignment of the Google page, if Plaintiff succeeds at arbitration.

### D.    Public Interest

"The final factor to evaluate in deciding upon a motion for preliminary injunction is whether the public interest would be served by the issuance of the injunction." *Certified Restoration*, 511 F.3d at 551 (cleaned up).

The Court concludes that this factor is neutral.

First, although "[e]nforcement of contractual duties is in the public interest," *id.*, this case presents substantial questions concerning whether Plaintiff's own misconduct effectively forced Defendants to leave Fetch! and start competing businesses. At the same time, the public interest "generally favors continuity of

34

business operations, especially when the business is a successful franchise . . . ."
*Kahala Franchising*, 2022 U.S. Dist. LEXIS 91420 at *17.  For these reasons, and because it remains unclear whether Plaintiff, Defendants, or both are at fault in this case, the public interest is neutral.

In sum, although this case presents a close call in various respects, the Court concludes that Plaintiff fails to carry its burden of showing that these circumstances clearly demand a preliminary injunction (excepting the limited relief continued from the TRO hearing).  Specifically, the balance of the preliminary injunction factors warrants denying such relief, and arbitration would not be meaningless absent such relief.

* * *

For the reasons given, the Court ORDERS that Plaintiff's request for a preliminary injunction (*See* ECF Nos. 2, 20) is GRANTED IN PART AND DENIED IN PART.

IT IS FURTHER ORDERED that Defendants cease use of all Fetch! federally-registered trademarks, including (but not limited to) in website communications, business directories, and promotional materials.  This does not include customer reviews on websites such as Yelp or Google that mention Fetch!.

Defendants, however, may not link to such reviews for use on their own websites if the reviews mention Fetch!.

IT IS FURTHER ORDERED that Defendants, and their successors and assignees, are hereby enjoined from communicating—directly or through third parties—with any existing Fetch! Pet Care, Inc. franchisee, about any issue or subject pertinent to the pending litigation. Nothing in this order shall preclude defense counsel from speaking to his existing clients.

IT IS FURTHER ORDERED that Plaintiff's request for a preliminary injunction is denied in all other respects.

Dated: July 11, 2025                             s/Robert J. White
                                                 Robert J. White
                                                 United States District Judge

36